UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **NATHANIEL BURRAGE,** | ) | **CASE NO. 4:10CV2755** |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | **JUDGE SARA LIOI** |
| vs. | ) | |
| | ) | **MEMORANDUM OPINION** |
| **FEDEX FREIGHT, INC.,** | ) | |
| | ) | |
| DEFENDANT. | ) | |
| | ) | |

Before the Court is a motion for summary judgment (Doc. 22), filed by Defendant FedEx Freight, Inc. ("Defendant" or "FedEx"). Plaintiff Nathanial Burrage ("Plaintiff" or "Burrage") has filed a brief in opposition (Doc. 25); to which Defendant has filed a reply brief (Doc. 29). This matter is ripe for disposition. For the reasons that follow, Defendant's motion is **GRANTED**.

## BACKGROUND

On October 4, 2010, Burrage filed this action in the Mahoning County, Ohio, Court of Common Pleas, raising the following claims: Count 1 seeks a declaratory judgment, damages and injunctive relief for a hostile work environment in violation of Ohio Rev. Code § 4112.01, *et seq.*; and Count 2 seeks the same relief for a hostile work environment in violation Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. (Docs. 1-1, 15.)[1] On December 3, 2010, FedEx removed the action to this Court. (Doc. 1.) Defendant moves for

---

[1] Due to a filing error, the notice of removal filed by defendant omitted a page from the complaint. (Doc. 1-1.) Defendant filed the entire complaint as a supplemental exhibit to the notice of removal. (Doc. 15.)

summary judgment, arguing that Burrage cannot establish a hostile work environment claim under either federal or state law because the alleged harassment was not based on *his* national origin, was not severe and pervasive, and because FedEx can successfully assert an affirmative defense.

Burrage began working as a city driver for FedEx on April 4, 2005. (Burrage Dep. 40:24–41:4, 70:17–21.) (Doc. 23-1.) At that time, he was assigned to the Mansfield, Ohio terminal and was responsible for picking up freight from local shippers and delivering freight to customers in the Mansfield area. (*Id*. at 28:13–25, 30:8–31:21.) In or around October 2005, Burrage transferred to a road driver position, which required him to transport freight trailers between terminals, otherwise known as a "shuttle run." (*Id*. at 71:14–72:11.) In December 2005, he successfully bid on the "shuttle run" between the Mansfield and Youngstown, Ohio terminals. (*Id*. at 54:1–7.) He continued to bid on and drive this "shuttle run" through December 2008. (*Id.* at 87:19−90:1.)

Burrage alleges in his complaint that his supervisors and co-workers at the Youngstown terminal harassed him based on his African American race and/or color. (Compl. ¶ 7.) Burrage, who identifies himself as half-African American and half Caucasian,[2] alleges that this harassment began as early as December 2005 or early 2006 when his supervisor, Dennis Jamiot ("Jamiot") began referring to him as "Mexican" and "cheap labor," and using the terms "Andale, Andale" and "Arriba, Arriba." (Burrage Dep. 114:1–117:2.) At some point, Jamiot asked Burrage what race he was, and Burrage replied that he had a black father and a white mother and that he was not Mexican. (*Id*. at 116:3–8, 144:6–18.) Jamiot responded that Burrage

---

[2] Plaintiff asserts that his father is African American and his mother is Caucasian. (Burrage Dep. at 116:5.)

2

looked Mexican. (*Id*. at 144:12.) Burrage testified that he then proceeded to tell Jamiot a story about his ex-girlfriend who had wanted to introduce him to her family as "Mexican" rather than "black," asking Jamiot whether he agreed that this was "messed up." (*Id*. at 144:19–145:9.) Burrage alleges that he told Jamiot this story to impress upon him how offended he was by being called "Mexican," when he is in fact of mixed descent. (*Id*. at 116:9–19.) Jamiot laughed at Burrage's story and told him to get back to work, and continued to call him "Mexican." (*Id*. at 145:8–9.)

Shortly thereafter, Burrage alleges that two other supervisors, Ron Martin ("Martin") and Dave Minear ("Minear"), began treating him in a similar fashion. (*Id*. at 133:18–22.) Specifically, he asserts that, in early 2006, Martin and Minear also began referring to him as "Mexican" and "cheap labor," and using the terms "Andale" and "Ariba" when he was operating a forklift at the terminal. (*Id*. at 133:23–136:15.) Additionally, Burrage also alleges that Jamiot began throwing paperclips and chalk at him when he was driving the forklift. (*Id*. at 155:11–156:12.) Plaintiff believes that Jamiot threw paperclips at other employees, too. (*Id.* at 156:4-156:12.) Plaintiff contends that the alleged harassing conduct continued for approximately three years until late 2009, increasing in frequency over that period at a rate of anywhere from three times a week to once daily. (*Id*. at 118:21–119:1.)

In late 2008 or early 2009, several non-supervisory co-workers allegedly joined in the harassment. Burrage testified that these unidentified dockworkers drew his attention to graffiti on a trailer and asked him whether the statement made by the graffiti was true: that Mexicans were "proof that American Indians had sex with buffalos." (*Id.* at 126:12–127:7.) Burrage asserts he complained about this incident to Minear (who had also called him

3

"Mexican"), but that no corrective action was taken in response to his complaint. (*Id*. at 126:20-22.)

Burrage alleges that he reported all of this conduct to FedEx. First, he asserts that he complained to supervisor, Andy Yost ("Yost"), when Jamiot asked Burrage to re-tell the story about his ex-girlfriend to Yost. Burrage retold the story to Yost, asserting that he did so in the hopes of conveying to Yost that he was offended when his supervisors called him Mexican. (*Id*. at 142:3-13.)

Then, in the summer of 2009, Burrage spoke with Doug Stryffeler ("Stryffeler"), a shift manager in Youngstown, about how he was "being treated in Youngstown." (*Id*. at 95:21−101:4.) According to Burrage, Stryffeler approached him one day stating that Burrage did not seem to be himself anymore. Burrage testified that he proceeded to tell Stryffeler that "paper clips were being thrown, names being said," and that "racial names are being said." (*Id*. at 96:12−13, 99:17−22.) Burrage does not recall whether he actually told Stryffeler that his supervisors had called him "Mexican," but recalls telling him that he felt as if he was "being degraded," "embarrassed and shamed," and that he had generally lost interest in coming to work. (*Id*. at 100:20−24).

In January 2009, Burrage bid a position on the XTRA board, stating that he did so to escape the alleged harassment at the Youngstown depot. In this new position, he was required to fill-in for employees on vacation or run extra freight as needed. (*Id*. at 90:5–91:1.) The transfer resulted in a reduction of his income. (*Id*. at 90:5–91:1; 119:13–120:19.) In March and April 2009, Burrage returned to the Mansfield-Youngstown shuttle run because the shuttle run

4

paid better than the XTRA board. (*Id.* at 91:15–92:3.) After bidding on the shuttle run, he returned to bidding the XTRA board from May through November 2009.

According to Plaintiff, the last incident of harassment occurred on or around October 30, 2009, when he was on the XTRA board and was passing through the Youngstown terminal on his way to Snow Shoe, Pennsylvania. While in Youngstown, Plaintiff asserts that he said "hello" to Minear, who allegedly responded by saying, "I don't talk to Mexicans." (*Id.* at 147:16–20.) Shortly thereafter, on December 2, 2009, Plaintiff filed a charge with the Ohio Civil Rights Commission alleging racial harassment. (*Id.* at 147:23–148:10, 152:3–11.) That same month, Plaintiff bid on a city driver position and was transferred to the Mansfield terminal where he continues to work. (*Id.* at 85:12–17, 190:12–192:2.)

Defendant's motion for summary judgment argues, first, that Plaintiff cannot establish a hostile work environment claim because any harassment that occurred was not based on Burrage's own national origin or race, but instead upon perceived characteristics. Second, Defendant argues that the alleged harassment was not severe or pervasive and is, therefore, not actionable. Finally, Defendant asserts that it can establish an affirmative defense to liability.

**STANDARD**

Under Fed. R. Civ. P. 56, when a motion for summary judgment is properly made and supported, it shall be granted, "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a).

An opposing party may not rely merely on allegations or denials in its own pleading; rather, by affidavits or by materials in the record, the opposing party must set out specific facts showing a genuine issue for trial. Affidavits or declarations filed in support of or in

5

opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Rule 56(c)(4). A movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n,* 909 F.2d 941, 943–44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide, "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id.* at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322. Moreover, "the trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir. 1989) (citing *Frito–Lay, Inc. v. Willoughby,* 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been

established which create a genuine issue of material fact. *Fulson v. Columbus,* 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.*

## ANALYSIS

Plaintiff frames his harassment claims in terms of both federal and Ohio law. For hostile work environment claims in Ohio, "federal case law interpreting Title VII of the Civil Rights Act of 1964, [42 U.S.C. §] 2000e et seq., … is generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981). As both federal and state courts in Ohio apply the same standards to each claim, and the parties' respective arguments apply equally to Plaintiff's federal and state harassment claims, the Court will consider both claims together.

Title VII provides that "it shall be an unlawful employment practice for an employer … to discriminate against any individual … because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e–2(a). In his Complaint, Burrage alleges that he was "subjected to pervasive harassment on the basis of his African American heritage or color." (Compl. at ¶ 7.) In support, he alleges that: "[o]ver the past three years he was called, in a derogatory and pervasive manner, the term "Mexican" by virtue of his brown skin and black hair, was told he was cheap labor, and was chastised and insulted by the use of terms like 'ariba ariba'". (*Id.*) He further claims that this harassment "created a hostile work environment on the basis of race and/or color …." (*Id*. at ¶ 14.)

7

An employee asserting a violation of Title VII based upon a hostile work environment on the basis of race or color must establish: (1) that he is a member of a protected class; (2) that he was subjected to unwelcome racial or color-related harassment; (3) that the harassment was based on race or color; (4) that the harassment had the effect of unreasonably interfering with his work performance by creating an intimidating, hostile, or offensive work environment; and (5) that there is a basis for employer liability. *See Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999); *Boutros v. Canton Reg'l Transit Auth.*, 997 F.2d 198, 203 (6th Cir. 1993). While Defendant concedes that Burrage is a member of *a* protected class, it insists that, even when the evidence is viewed in a light most favorable to Burrage, he cannot establish the remaining four elements of his prima facie case and, therefore, summary judgment in favor of Defendant is appropriate. The Court begins with the second and third elements, dealing with the nature of the alleged harassment.

**A.     Discrimination Based on Race or Color**

Defendant argues that Burrage's harassment claims, based on being called "Mexican" and being subjected to related-terms and slurs including "cheap labor," must fail because Burrage is not Mexican. Noting that Burrage considers himself to be black, as he has an African-American father and a Caucasian mother, Defendant argues that Burrage "cannot demonstrate that he was subject to unwelcome harassment on the basis of his 'national origin.'"[3]

---

[3] While it is not entirely clear from Defendant's motion and supporting briefs, it would appear that Defendant believes that Burrage has raised a claim of national origin discrimination. A fair reading of the Complaint reveals that Burrage intended only to raise race and color discrimination as a basis for his hostile work environment claims. (*See* Compl. at ¶¶ 3, 7, 11, 14.) Nonetheless, as will be explained *infra*, the factual allegations in the Complaint, and the record evidence before the Court, arguably support only a claim of discrimination based upon a perception that he was of Hispanic descent, which is not recognized under federal or state law.

(Doc. No. 22-1 at 7.) Defendant insists that the derogatory terms were not directed at Burrage's race or color, but were born out of a mistaken perception that Burrage was of Hispanic descent.

It is true that Title VII protects only those who are actually in a protected class, and not those who are perceived to be in a protected class. Numerous district courts have rejected Title VII claims based on allegations that the plaintiff was perceived to be in a protected class. These courts have observed that, in contradistinction to the Americans with Disabilities Act ("ADA") or the Rehabilitation Act, Title VII contains no provision for those wrongly perceived to be of a certain national origin. *See* 42 U.S.C. § 2000e-2. These courts hold that if Congress had intended Title VII to protect persons from discrimination based on perceived characteristics, it would have explicitly done so by using language similar to that found in the ADA or the Rehabilitation Act. *See Butler v. Potter,* 345 F. Supp. 2d 844, 850 (E.D. Tenn. 2004) (noting Title VII says nothing about protection of persons perceived as belonging to a protected class); *see, e.g., El v. Max Daetwyler Corp.,* No. 3:09CV415, 2011 U.S. Dist. LEXIS 49645, at *12-*15 (W.D.N.C. May 9, 2011) (granting defendant's motion to dismiss discrimination claim where the plaintiff was only perceived as, but actually was not, Muslim); *Adler v. Evanston Nw. Healthcare Corp.*, No. 07CV4203, 2008 U.S. Dist. LEXIS 101744, at *11 (N.D. Ill. Dec. 16, 2008) ("Title VII contains no provision for those wrongly perceived to be of a certain national origin."); *Lewis v. N. Gen. Hosp.,* 502 F. Supp. 2d 390, 401 (S.D.N.Y. 2007) ("[T]he protections of Title VII do not extend to persons who are merely 'perceived' to belong to a protected class."); *Lopez-Galvan v. Mens Wearhouse,* No. 3:06 CV 537, 2008 U.S. Dist. LEXIS 53456, at *23 (W.D.N.C. July 10, 2008) (dismissing Title VII claims based on "perceived race").

Burrage posits, however, that he has not brought claims of discrimination based on perceived national origin, but rather that his claims are grounded in allegations of race and color discrimination. However, Burrage fails to come forward with evidence that any of the alleged harassing events were based on his race (African-American) or had a racial character or purpose. *See Watkins v. Tex. Dep't of Crim. Justice*, 269 F. App'x 457, 464 (5th Cir. 2008) (affirming the district court's grant of summary judgment on race discrimination claim, noting that the plaintiff was attempting to "impart a racial character" to certain non-race related events); *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir. 1999) (noting that, although the challenged conduct need not be explicitly racial, it must have a "racial character or purpose to support a Title VII claim"). Nor do these remarks support a finding that the harassment was based on Burrage's skin color. *Compare Wiltz v. Christus Hosp. St. Mary*, No. 1:09CV925, 2011 U.S. Dist. LEXIS 44893, at *33 (E.D. Tex. Mar. 10, 2011) (recommending the denial of summary judgment of a color-related race claim because comments, such as "the blacker the berry, the sweeter the juice," had a color-related character or purpose), *adopted by, and summary judgment for employer on the hostile work environment claim denied at*, 2011 U.S. Dist. LEXIS 44891 (E.D. Tex. Apr. 25, 2011).

At best, the references to Burrage as "the Mexican" and "cheap labor," and the use of the Spanish terms "andale" and "ariba," represent the very unfortunate employment of offensive stereotypes of Hispanics, and can be said to arise out of a misperception that Burrage was of Hispanic descent; or at worst, they amount to incomprehensible name calling. They cannot reasonably be considered to have referred to the fact that Burrage's race was African-American or that his skin color was brown, notwithstanding Burrage's conclusory allegations to

the contrary.[4] *See, generally, Lee v. United States Postal Serv.,* 12 F. App'x 322, 323 (6th Cir. 2001) ("Mere conclusory allegations of discrimination are insufficient to state a claim under Title VII.") (citing *Allen v. Michigan Dep't of Corrs.*, 165 F.3d 405, 413 (6th Cir. 1999).

Still, Burrage insists that he may rely on these national origin based-comments to meet his burden at the summary judgment stage of demonstrating a prima facie case of racial or color discrimination. He reasons that "because a review of the 'totality of the circumstances' guides the analysis, discrete acts not clearly indicative of racial animus may be considered, together with race related comments." (Doc. No. 25 at 5.) While, when considered in a vacuum, this is an accurate statement of the law, it does not follow that comments supporting one type of discrimination can provide the sole support for a claim for a separate and distinct form of discrimination.

The Sixth Circuit has held that "[c]onduct that is not explicitly race-based may be illegally race-based and properly considered in a hostile-work-environment analysis when it can be shown that but for the employee's race, [he] would not have been the object of harassment." *Clay v. UPS*, 501 F.3d 695, 706 (6th Cir. 2007) (citing *Farmer v. Cleveland Pub. Power*, 295 F.3d 593, 605 (6th Cir. 2002)). Applying this "but for" test, the Sixth Circuit has held that a plaintiff may prove that harassment was based on race discrimination by establishing by either (1) direct evidence of race-specific and derogatory terms or (2) comparative evidence about how the alleged harasser treated both races in the workplace. *See Williams v. CSX Transp. Co.*, 643

---

[4] Even the graffiti appearing on a trailer that Mexicans were "proof that American Indians had sex with buffalos" is a clear reference to peoples of Hispanic descent, and not a reference to the race or color of any individual (and is most certainly not a reference to Burrage's status as an African-American). Moreover, the defiled trailer was an isolated incident that was not directed at any particular person. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotes and citations omitted) ("simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory charges in the terms and conditions of employment").

F.3d 502, 511 (6th Cir. 2011). In other words, racially neutral conduct or treatment can be used to support a race claim if the plaintiff can demonstrate that white employees were not subjected to the same treatment. For example, in *Clay*, the court found that the seemingly race neutral treatment of the plaintiff by her supervisor—criticizing the route she took to get to her work station and her practice of leaving her work station to get a cup of coffee—could support a claim of race discrimination because the plaintiff demonstrated that white co-workers were not subjected to the same treatment. In other words, the court found that "but for" the plaintiff's race she "would not have been the object of harassment." 501 F.3d at 706.

While the "but for" test permits a plaintiff to rely on discrete acts not clearly indicative of racial animus to support a race claim where others outside the protected class are treated differently, it stretches the test too far to suggest that comments that are clearly based on a different type of discrimination (here, national origin discrimination) can be relied upon to support a race or color claim, in the absence of racially charged comments or evidence that white employees were subjected to different treatment.[5] *Compare Hafford*, 183 F.3d at 515 (noting that "[a]lthough there is enough evidence of racial harassment for that claim to stand on its own, the district court should allow at trial for consideration of the possibility that the racial animus of Hafford's co-workers [from the plaintiff's status as a black Muslim] was augmented by their bias against his religion [Islam]").

Yet this is precisely what Burrage wishes to do. In essence, he alleges that "but for" his skin color, he would not have been perceived as being Mexican or Hispanic. This

---

[5] Burrage offers no evidence that white workers were not subjected to the same types of taunts or name-calling. Further, while he complains that one of his supervisors threw chalk and paperclips at him, Burrage concedes that this same supervisor threw paperclips at other employees too. (Burrage Dep. at 155:11−156:12.)

12

circular logic cannot serve to recast a national origin claim into one of race or color. "[R]ace and national origin are ideologically distinct under Title VII." *Kun v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 949 F. Supp. 13, 19 (D.D.C. 1996) (citing *Espinoza v. Farah Mfg. Co., Inc.*, 414 U.S. 86, 88 (1973) ("The term 'national origin' on its face refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came.") "The legislative history [of Title VII] enunciates precisely that a person's national origin has nothing to do with color, religion, or race." *Roach v. Dresser Indus. Valve & Instrument Div.*, 494 F. Supp. 215, 216 (W.D. La. 1990). While there is certainly overlap between the two types of discrimination, this is not a case where issues of national origin and race are so intertwined that it is difficult to separate the two for purposes of analysis; such as in the case where an employee believes that he has been subjected to discrimination but he cannot determine whether it can be traced to a personal characteristic common to people of a certain national origin or his national origin, itself.[6] *See Deravin v. Kerik*, 335 F.3d 195, 202 (2d Cir. 2003) (quoting *Adames v. Mitsubishi Bank, Ltd.*, 751 F. Supp. 1548, 1559 (E.D.N.Y. 1990) ("because racial categories may overlap significantly with nationality or ethnicity, 'the line between discrimination on account of race and discrimination on account of national origin may be so thin as to be indiscernible' ")); *see, e.g., Alonzo v. Chase Manhattan Bank, N.A.*, 25 F. Supp. 2d 455, 458 (S.D.N.Y. 1998) (rejecting the argument that the plaintiff had failed to exhaust his administrative remedies by framing his charge in terms of national origin instead of race, noting that "it is substance of the charge and not labels that controls").[7]

---

[6] Even if the Court were to characterize the discrimination as racial, the record would not bear out that Burrage was harassed on the basis of *his* race (African-American).

[7] In *Alonzo*, the employee charged in his EEOC complaint that he was discriminated against because he was

13

In this regard, the Court finds the decision in *Lopez* instructional. In *Lopez*, the plaintiff described his race as "Latin," and the court found that his national origin was "Dominican." 2008 U.S. Dist. LEXIS 53456, at *8, *23-*24. However, he asserted he was perceived as being black and harassed on the basis of this misperception. In essence, he argued that his actual race (Latin) and his national origin (Dominican) led others to conclude that he was black. Because the plaintiff's claim hinged on the mistaken perception that he was black (rather than his actual race), the court dismissed his "perceived as" discrimination claim. *See id.* at *23-*34.

A similar analysis leads to the conclusion that Burrage's harassment claims must fail. Like the plaintiff in *Lopez*, Burrage seems to argue that he was harassed because of physical characteristics that made him appear to be a member of a protected class of which he was not an actual member.[8] Claims based on perceived class membership are not legally viable under Title VII, and the Court will not expand the reach of Title VII to cover that which Congress chose not to protect. *See Butler*, 345 F. Supp. 2d 850.

In the final analysis, it matters not whether the Court views Burrage's claims as race and color harassment claims or perceived national origin claims. Viewing the facts in the light most favorable to Burrage, the claims, however cast, must fail. If viewed as race and color

---

Hispanic. The court noted that, "while the term 'black' is not associated with national origin, some courts have treated "Hispanic" as a racial category." *Id.* at 459 (collecting cases). This logic serves to underscore the disconnect between Burrage's suggestion that his treatment as a perceived Hispanic was the result of his status as an African-American, as he alleges in his Complaint. (*See* Compl. at ¶ 4.)

[8] In his deposition, Burrage testified that, after he had repeatedly been referred to as "Hispanic," Jamiot asked Burrage what his race was. Burrage replied by explaining that he was bi-racial, half black and half white. (Burrage Dep. at 144:10−11.) Notwithstanding this clarification, supervisors and co-workers continued to use the same ethnic terms, including "the Mexican." Further, Burrage does not maintain that his supervisors and co-workers began to use any terms that were racial in nature or otherwise related to his status as an African-American, upon learning of his true race.

14

claims, they fail because Burrage has not pointed to any specific facts in the record to establish a genuine issue of material fact that he was harassed because of his race or color. *See Fulson*, 801 F. Supp. at 4. If the claims are viewed as based upon perceived membership in a particular class, then they fail because they are not cognizable under federal or state law. *See Butler*, 345 F. Supp. 2d at 850. Either way, summary judgment for Defendant on these claims is appropriate.

**B.     FedEx's Affirmative Defense**

Since the Court has determined plaintiff cannot establish that he was discriminated against or harassed based on his race or color, or on a theory of "perceived" national origin, it actually need not address any additional elements of the test for a hostile work environment. Nonetheless, in an abundance of caution, the Court will also discuss another significant reason why plaintiff's claims would fail even if he were able to establish discrimination or harassment.

Defendant argues that plaintiff has failed to establish the fifth element of a prima facie case, namely, that FedEx is liable for any actionable conduct. An employer may not be held liable for a hostile work environment unless the plaintiff can show that the employer "tolerated or condoned the situation." *Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 349 (6th Cir. 1988). Employer liability for discriminatory or harassing acts of a supervisor is vicarious. Where, as here, no tangible employment action is taken against a plaintiff, an employer may show by a preponderance of the evidence (1) that it exercised reasonable care to prevent and correct promptly any discriminatory or harassing behavior, and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by

the employer. *Faragher*, 524 U.S. at 805.[9] "Generally, an employer satisfies the first part of this two-part standard when it has promulgated and enforced a … harassment policy." *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 275 (6th Cir. 2009) (citation omitted).[10]

Here FedEx had in place an anti-harassment policy whereby an employee could report discriminatory or harassing conduct. (*See* Burrage Dep., Exs. K & M.) Plaintiff admitted knowledge of this policy and its procedures. Although the procedures involved reporting to one's supervisor as a first line of defense, where, as here, an employee felt he was being harassed by his supervisor or that his supervisor was being unresponsive to his complaints, the policy directed the employee to use the company's telephone Alert Line to report the offensive behavior. By his own admission, plaintiff never availed himself of these avenues. Nor did he attempt to talk directly with anyone in the human resources department, which was another avenue available under the policy. Plaintiff testified at his deposition that he had heard from others over the years that these procedures were ineffective, so he did not bother to use them (Burrage Dep. at 187:4−188:3); however, plaintiff has supplied no independent affidavits from

---

[9] Although plaintiff's primary complaints related to supervisory harassment, he also asserts that his co-workers harassed him, that supervisors knew about it, and that nothing was done by way of remedy. "Employer liability for co-worker harassment is based directly on the employer's conduct." *Hafford*, 183 F.3d at 513. An employer is liable if it "knew or should have known of the charged ... harassment and failed to implement prompt and appropriate corrective action." *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 804 (6th Cir. 1994). Plaintiff points to a single instance where he allegedly complained to a supervisor, Dave Minear, when unidentified dockworkers asked him if certain graffiti was true (relating to Mexicans being proof that Indians had sex with buffalos). According to plaintiff, Minear took no action on his complaint. This is an example of focusing on one incident that is simply too isolated to support a claim of co-worker discrimination or harassment. Furthermore, since Minear was himself an alleged harasser, it would have been unreasonable for plaintiff to not use defendant's Alert Line to report this alleged co-worker harassment, since he obviously would have had reason to doubt that Minear would respond to the complaint and, in fact, indicated as such in his deposition.

[10] Although *Gallagher* involved a claim for hostile work environment sexual harassment, "[h]ostile work environment claims based on racial harassment are reviewed under the same standard[.]" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (citing *Faragher*, 524 U.S. at 786-87, and n. 1; *Meritor Savings Bank FSB v. Vinson*, 477 U.S. 57, 66-67 (1986)).

any of his co-workers to verify what is, at this point, merely hearsay and speculation as to the effectiveness of defendant's procedures.[11]

Even the "complaints" plaintiff claims he made to his supervisors are not clear enough to constitute sufficient notice to the employer under the policy; at best, he gave only very subtle, cryptic hints that he found the conduct offensive. Plaintiff was questioned repeatedly at his deposition about how and when he made his complaints. His testimony was uniformly ambiguous. For example, he complained to Chris Leonard "just telling him how they treated– basically wasn't treating me right." (Burrage Dep. at 122:18−19.) He admitted that he did not know if he "brought up Mexican to him at that point or not." (*Id*. at 122:20−21.) He also did not recall telling Leonard specifically that he was being harassed based on his race, that he was being called Mexican, or that he was being subjected to jokes based on his ancestry. (*Id*. at 123:4−10.) When asked if he had ever told anyone other than Leonard that he wanted to transfer from Youngstown because of harassment, he answered: "I'm pretty sure I have. I don't recall a particular situation." (*Id*. at 196:4−5.) He alleges he told another supervisor, Jim Kuffman, "that Youngstown isn't a great place to be," that it is "horrible," and that he did not "like the way they treat me there." (*Id*. 197:22−24.) Finally, he claims the story of his ex-girlfriend trying to pass him off as Mexican, rather than black, to make him more acceptable to her parents, should have been sufficient warning to his supervisors that he did not like being referred to as a Mexican. (*Id*. at 146:24−147:3) ("I said, isn't it wrong for her to call me Mexican than for what I really am? If I say it's wrong for her, I assume that they realize that it was wrong for them too or anybody.").

---

[11] In fact, after plaintiff filed his complaint with the Ohio Civil Rights Commission, defendant conducted an investigation into the charge and, ultimately, required all three supervisors to attend additional training on the company's anti-harassment policies. (Muncio Decl. ¶¶ 6-9.)

None of these instances is clear enough for an employer to ascertain that plaintiff was complaining about anything more than ordinary uncomfortable work situations or teasing that had crossed a line, as opposed to harassment or discrimination.

In light of the above, even if plaintiff were able to establish the other elements of a hostile work environment, the Court is of the view that FedEx would have a viable, unrebutted defense.

## CONCLUSION

For the reasons set forth, defendant's motion for summary judgment is **GRANTED** and this case is **DISMISSED**.

**IT IS SO ORDERED**.

Dated: March 29, 2012

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**